

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:SKW                                  *271 Cadman Plaza East*
F. #2018R02303                           *Brooklyn, New York 11201*

November 28, 2022

By Email and ECF

The Honorable William F. Kuntz, II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Molissa Gangapersad
             Criminal Docket No. 19-CR-004 (WFK)

Dear Judge Kuntz:

        The government submits this memorandum in advance of the defendant's sentencing which is scheduled for December 12, 2022. For the reasons detailed below, the government respectfully recommends that the Court sentence the defendant to an above-Guidelines sentence of 12 months' imprisonment.

      I.    <u>Factual Statement</u>

        As set forth in more detail below, on December 8, 2018, the defendant set off a chain of events that resulted in the shooting of Federal Bureau of Investigation ("FBI") Special Agent Christopher Harper. Specifically, the evidence at trial established that the defendant saw Agent Harper sitting in his car outside of her house, called her boyfriend Ronnell Watson to come confront Agent Harper, and then watched as Watson shot Agent Harper multiple times. One of those bullets pierced Agent Harper's back and caused his lung to collapse, requiring emergency life-saving surgery. To cover up her own role in the shooting, the defendant repeatedly lied to the FBI about having witnessed the shooting, about her own involvement in the shooting, and about her knowledge of important evidence in the investigation. The defendant's lies were material and impacted the FBI's investigation into the shooting and its ability to secure the safety of the community.

A.  The Defendant's Involvement in the Shooting of Agent Harper

On December 8, 2018, at approximately 3:09 p.m., Agent Harper, who was conducting surveillance on an unrelated target, parked his Nissan Maxima in front of 1626 Canarsie Road in Canarsie, Brooklyn, where the defendant and her boyfriend Ronell Watson lived together.  (Government Exhibit "GX" 1A; Trial Transcript "Tr." 166:1-167:2).  Agent Harper happened to be sitting in his car wearing a red sweatshirt, the color of the Bloods, a rival gang of the Crips, which was Watson's gang.  (Tr. 188:14-15; 246:3-13).

According to surveillance video, approximately six minutes after Agent Harper parked his car in front of 1626 Canarsie Road, the defendant stood in the entryway of her home, looking out at the street where Agent Harper was parked.  (GX 1F).  Less than three minutes later, while still standing in the entryway of her home, the defendant called Watson on the phone and stayed on the telephone with Watson for 4 minutes and 15 seconds.  (GX 29, 33; Tr. 446:20-24).  Soon after the defendant called Watson, one of the defendant's neighbors walked up to the house and the defendant asked her neighbor "who was in the Maxima," establishing that the defendant was focused in on Agent Harper sitting in his car.  (Tr. 408:20-409:7).

Approximately three minutes after the defendant called Watson, while they were still on the phone call, Watson drove his black BMW in the wrong direction down Canarsie Road, which is a one-way street.   (GX 3; Tr. 170:10-11).  According to Watson's T-Mobile records, Watson did not make or receive any other phone calls in the hour before the defendant called him.  (GX 36; Tr. 448:24-449:2).  Thus, the circumstantial evidence strongly suggests that the defendant called Watson for the specific purpose of having him drive home and confront Agent Harper.

Watson then stopped his car in the middle of the road, got out, and confronted Agent Harper who was sitting in his parked Nissan Maxima.  (GX 1, 1B, 1C; Tr. 170:17-171:15).  Agent Harper testified that Watson approached him aggressively, with one hand hidden in his sweatshirt.  (Tr. 172:22-173:3).  Agent Harper sensed he was in danger, so he tried to drive away.  (Tr. 173:8-174:22).  But at approximately 3:19 p.m., as Agent Harper put his car into gear, Watson shot at Agent Harper multiple times.  (GX 1B, 1C, 1E; Tr. 174:22-175:6).  One of the bullets pierced Agent Harper's back and caused his lung to collapse, but he managed to drive a few yards forward, get out of his car, and use his service weapon to return fire at Watson.  (Tr. 174:7-23; 178:10-14; 190:10-15).  Watson then got back in his BMW and drove away in the wrong direction down Canarsie Road.  (Tr. 176:9-12).

The surveillance video established that the defendant stayed in the entryway of her home watching Watson shoot Agent Harper.  Both the video and phone records confirmed that the defendant remained on the telephone with Watson throughout the shooting.  A still image from the surveillance video of the defendant watching Watson shoot agent Harper and flee the scene is below.



Approximately three hours after the shooting, before speaking to the FBI, the defendant used her cell phone to make a copy of the surveillance video that showed Watson shoot Agent Harper.  (GX 38, 38A, 38B).  The defendant subseqnetly emailed herself a copy of that video.  (GX 38D, 38E).  A still image of the video of the shooting saved on the defendant's cell is below.



B.  The Defendant's False Statements

Later that night, after Watson was identified as a person of interest in the shooting, FBI agents went to the defendant's apartment and asked her what she knew about the shooting.  (Tr. 244:3-16).  Despite having called Watson before the shooting, witnessed the entire exchange between Watson and Agent Harper from the entryway of her apartment, and saving a video of the shooting on her phone, the defendant lied and claimed not to have seen the shooting or know anything about it.  (Tr. 244:11-21; 336:3-21).  Notably, the defendant provided derogatory information about Watson—including telling the FBI Watson was in a gang and hustled on the street to make money—but lied about information that connected her to the shooting in any way.  (Tr. 245:14-246:22).

Having no reason at that time to believe the defendant was lying, the FBI agents ended the interview and continued to investigate the shooting, including by interviewing other potential witnesses and by obtaining and executing a search warrant of Watson's apartment. Importantly, at the time of the defendant's false statements, the gun used to shoot Agent Harper had not been located and the FBI did not know whether Watson acted alone or whether there was an unidentified coconspirator involved.  Thus, the FBI continued to look for Watson's gun—which was never recovered—and investigate the shooting.

Approximately three hours later, FBI agents discovered surveillance video from 1626 Canarsie Road's home surveillance system which showed the defendant in the doorway of her home and on her porch watching Watson confront and shoot Agent Harper.  (Tr. 250:1-10; 251:10-252:4).   Agents then went back to the defendant and told her they knew she witnessed the shooting.  (Tr. 256:7-14).  The defendant continued to lie, stating that she "didn't see shit."  (Tr. 256:15-21).  Only after being shown the surveillance video of herself did the defendant admit to being on the porch and seeing Watson drive up and approach Agent Harper "like he had beef," witnessing Watson "point," and hearing gunshots, all of which were contrary to what she told the FBI agents three hours earlier.  (Tr. 257:10-18; 259:2-8; 261:13; 262:8).  The defendant, however, claimed to have been discussing a "missing car" while on the phone with Watson before the shooting.  At trial, the agents testified that the defendant's claim was unlikely given the timing of the defendant's phone call to Watson and the fact that Watson aggressively drove in the wrong direction down a one-way street and confronted Agent Harper out of the blue.  (Tr. 260:14-262:9-14; 404:16-408:9).

C.   The Defendant's Trial Conviction and Pre-Sentencing Conduct

For her conduct, the defendant was charged with one count of making materially false, fictious and fraudulent statements and representations to agents of the FBI in violation of Title 18, United States Code, Section 1001(a)(2).  See ECF No. 11.  After a three-day trial beginning on May 23, 2022, the jury unanimously found the defendant guilty.  See ECF No. 223.

According to the Presentence Investigation Report ("PSR"), the defendant has not complied with all the Court-ordered conditions of her release.  Specifically, the PSR noted that the defendant repeatedly failed to report by telephone to her Pretrial Services Officer in May 2022, June 2022, July 2022, August 2022, and October 2022 (the month the PSR was issued to the parties).  The defendant also has failed to submit to bimonthly random drug tests.  See PSR ¶ 4.  According to the PSR, when the defendant's Pretrial Services Officer confronted the defendant about her non-compliance, the defendant stated that she knew what is expected of her, yet she continued to fail to comply.  See id.

II.   Applicable Law

Title 18, United States Code, Section 3553(a) requires a sentencing court to "determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'"  Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018) (quoting 18 U.S.C. § 3553(a) and Tapia v. United States, 564 U.S. 319, 325 (2011)).  "[I]n determining the particular sentence to be imposed" the Court is required to consider both the sentencing factors set forth at § 3553(a)(2), as well as the sentencing range established by the Sentencing Commission for the applicable category of offense and offender.  See 18 U.S.C. § 3553(a)(4).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.     Sentencing Guidelines

Applying the U.S. Sentencing Guidelines Manual to the facts detailed above, the government submits that the PSR sets forth the applicable Guidelines calculation, which is reflected below:

Base Offense Level (U.S.S.G. § 2B1.1(a)(2))               6

Total:                                                                            <u>6</u>

See PSR ¶ 25. The defendant does not have any prior criminal convictions, and thus her criminal history is Category I. See PSR ¶ 28. At Criminal History Category I, an offense level of 6 carries an advisory Guidelines sentencing range of 0 to 6 months' imprisonment. See PSR ¶ 71.

IV.     The 18 U.S.C. § 3553(a) Sentencing Factors

The government has carefully considered the facts of this case and the full range of factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a), and respectfully recommends that a sentence of 12 months' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.  See 18 U.S.C. § 3553(a).

Notably, the defendant's conduct is serious and should be punished.  The evidence at trial established that the defendant set the shooting of Agent Harper in motion when she saw Agent Harper sitting in his car and called Watson on the telephone.  In order to cover up her involvement, the defendant then lied to the FBI about what she did and what she saw.  Thus, in the critical hours after the shooting of an on-duty FBI agent—when the gun use in the shooting was still missing and the FBI had not fully determined who was involved or what happened—the defendant's false statements impaired the investigation.  An incarceratory sentence is therefore necessary to reflect the seriousness of the defendant's criminal conduct.  See 18 U.S.C. § 3553(a)(2)(A).

In addition, an incarceratory sentence is necessary for specific and general deterrence.  See 18 U.S.C. § 3553(a)(2)(B).  Telling, the defendant continues to downplay the seriousness of her conduct and has never expressed remorse for her actions.  For example, in the interview with her Probation Officer, the defendant failed to acknowledge the effect of her conduct, instead focusing on herself and telling the Probation Officer: "I get so pissed.  It is not fair that I have to go through this."  See PSR ¶ 45.  The defendant's apparent lack of remorse strongly suggests that a prison sentence is necessary for specific deterrence.

Moreover, an incarceratory sentence promotes general deterrence.  While no one is obligated to speak to law enforcement officers, it is a crime to lie to the FBI about a material fact.  This is especially true when the false statement prevents the FBI conducting important investigative work to protect the community from gun violence.  The sentence the Court imposes should deter others from making similar false statements, especially during the critical hours after a shooting in connection with an attempted murder investigation.

V.    <u>Conclusion</u>

        For the foregoing reasons, the government respectfully recommends a sentence of 12 months' imprisonment.  The government does not object to delaying the defendant's surrender date until 2023.

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York

                        By:    /s/ Sara K. Winik
                                        Sara K. Winik
                                        Assistant U.S. Attorney
                                        (718) 254-6058


cc:    Clerk of Court (WFK) (by ECF and Email)
        Defense Counsel (by ECF and Email)